**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DONALD I. CARRINGTON,
Plaintiff-Appellant,

v.

JAMES B. HUNT, JR., in his capacity
as Governor of North Carolina and

No. 95-3117

individually; ANN Q. DUNCAN, in her
capacity as Chairman of the
Employment Security Commission
of North Carolina and individually,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, District Judge.
(CA-94-324-5-BR2)

Argued: October 30, 1996

Decided: January 3, 1997

Before HALL and ERVIN, Circuit Judges, and BUTZNER,
Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** John Charles Hunter, Greensboro, North Carolina, for
Appellant. Tiare Bowe Smiley, Special Deputy Attorney General,

NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** James R. Trotter, Greensboro, North Carolina, for Appellant. Michael F. Easley, North Carolina Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina; T. S. Whitaker, Chief Counsel, V. Henry Gransee, Jr., Deputy Chief Counsel, EMPLOYMENT SECURITY COMMISSION OF NORTH CAROLINA, Raleigh, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Donald Carrington appeals a judgment for the defendants, North Carolina's governor and a department chairman, in Carrington's suit alleging due process and First Amendment violations arising from the termination of his public employment. Finding no error, we affirm.

I.

Carrington was formerly the Deputy Director of a division of the North Carolina Department of Employment Security. In 1992, Jim Hunt was elected Governor. The next spring, as required by N.C. Gen. Stat. § 126-5(d)(3), Hunt designated which policymaking positions in state government would be exempt from the job security protections of the State Personnel Act. The list Hunt submitted on April 29, 1993, designated Carrington's position as exempt. Carrington had not had such a designation under the prior administration; overall, however, Hunt designated fewer positions as exempt than his predecessor. On May 4, 1993, Carrington acknowledged receipt of a notice of the change, to be effective in ten days.

Meanwhile, there was public debate about a plan to cut unemployment insurance premiums. Because the state unemployment fund was

2

laden with cash, Hunt and the chairman of Carrington's department, defendant Ann Duncan, were proposing a substantial cut. Carrington favored an even deeper cut, and was apparently somewhat piqued at being left off of the committee studying the idea.

Carrington spoke to a reporter for a local weekly newspaper. The reporter published remarks from an unnamed source within the Employment Security Department that were critical of the administration's plan and that advocated a deep cut in premiums. When the remarks were brought to Duncan's attention, she was upset that her efforts were being undermined from within. She asked a subordinate to remind staff about unauthorized statements to the press. She directed a friend of Carrington, his immediate supervisor Gregory Sampson, to ask him whether he was the source of the remarks. Carrington denied it, and Duncan made no further effort to investigate.

The following summer, the state implemented the recommendations of a Governmental Performance Audit, which had been performed by Peat Marwick at the direction of the legislature. The purpose of the audit was to eliminate duplicative or otherwise unnecessary positions. The audit concluded that Carrington's division did not need both a director (Sampson) and deputy director (Carrington). Carrington's position was eliminated, as were all other Employment Security jobs named in the audit. He soon filed this suit against Hunt and Duncan, alleging due process and First Amendment violations, and seeking damages and equitable relief.

Summary judgment for the defendants was eventually granted on all claims except a claim for injunctive relief based on an alleged First Amendment violation. After a bench trial, the district court ruled for the defendants on this claim as well.

Carrington appeals.

II.

Carrington first asserts that his change from non-exempt to exempt status violated due process. We disagree.

3

As we recently explained in a quite similar case, <u>Mandel v. Allen</u>, 81 F.3d 478 (4th Cir. 1996), a state employee has no property interest in continued non-exempt status if state law gives the executive discretion to determine which positions are exempt and to change such designations. Inasmuch as state law defines any property interest, the employee is stuck with the interest that the legislature defined. North Carolina law allows a newly elected governor to designate exempt policymaking positions by May 1 of his first year. Accordingly, no policymaking employee has a property right not to be so designated. <u>Mandel</u> is dispositive.

Even if there were a property interest here, North Carolina law provides sufficient process to guard against its erroneous deprivation. The affected employee is entitled to ten working days' notice before the change in status, N.C. Gen. Stat. § 126-5(g), and he may appeal to the State Personnel Office if he believes that the designation is illegal or in error. § 126-5(h). Carrington received his ten days' notice and did nothing. He has also been offered another position in Employment Security, because state law grants him preferential rehire rights, § 126-5(e), but he declined it.

The district court correctly granted summary judgment on Carrington's due process claim.

III.

We next turn to the First Amendment claim.[1] Carrington first challenges the district court's entry of a summary judgment in favor of defendant Duncan as to any claim for money damages. [2] This judgment was based on qualified immunity. In general, a public official performing discretionary functions is entitled to qualified immunity from liability for damages unless his actions violate clearly established law of which a reasonable person should have known. <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).

_____

[1] This claim was pled only against defendant Duncan.

[2] The district court doubted that Carrington had even pled such a claim, but it assumed he had for purposes of argument.

4

The law is certainly not "clearly established" that a policymaking public employee may not be discharged for criticizing his superiors or their policies. Indeed, the Supreme Court has strongly implied just the opposite, albeit in dicta:

> [I]n weighing the State's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where, as here, an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal.

Rankin v. McPherson, 483 U.S. 378, 390-391 (1987). More recently, a plurality of the Court stated the point clearly, again in dicta, but dicta most emphatic:

> [T]hough a private person is perfectly free to uninhibitedly and robustly criticize a state governor's legislative program, we have never suggested that the Constitution bars the governor from firing a high-ranking deputy for doing the same thing.
>
> * * *
>
>  [T]he extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. The reason the governor may, in the example given above, fire the deputy is not that this dismissal would somehow be nar-

5

rowly tailored to a compelling government interest. It is that the governor and the governor's staff have a job to do, and the governor justifiably feels that a quieter subordinate would allow them to do this job more effectively.

Waters v. Churchill, 114 S.Ct. 1878, 1886-1888 (1994) (plurality opinion).**3**

Though this circuit has never faced the question squarely, the First and Seventh Circuits have held that a confidential or policymaking employee open to discharge on account of political affiliation is likewise subject to discharge for speech critical of his employer. Rodriguez Rodriguez v. Munoz Munoz, 808 F.2d 138, 145 (1st Cir. 1986); Warzon v. Drew, 60 F.3d 1234, 1239 (7th Cir. 1995).

We need not resolve the point authoritatively today. Even if Carrington's policymaking position were not in and of itself enough to render his firing legal, Duncan would still be entitled to qualified immunity on the First Amendment claim, for two independent reasons.

First of all, if Duncan could reasonably have believed that Carrington's criticism of the tax cut plan would disrupt the functioning of her office, she should not be liable in damages (though Carrington might theoretically be entitled to reinstatement). Monetary liability does not attach to "bad guesses in gray areas," but rather only to violations of "bright lines." Maciarello v. Sumner, 973 F.2d 295 (4th Cir. 1992), cert. denied, 506 U.S. 1080 (1993). Bright lines are difficult to find in the First Amendment/public employee context:

> Indeed, only infrequently will it be "clearly established" that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a "particularized balancing" that is subtle, difficult to apply, and not yet well-defined.

_____

**3** Though Justice O'Connor's plurality opinion was joined by only three other justices, the concurring and dissenting opinions provided majority support for each of its conclusions of law. Thus, it states the holding of the Court. See id. at 1893 (Souter, J., concurring).

6

DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir. 1995). See also Connick v. Myers, 461 U.S. 138, 154 (1983) (deeming it "[n]either appropriate [n]or feasible to attempt to lay down a general standard against which all statements may be judged"). As we noted above, it is a most doubtful proposition that a public official of Carrington's high rank enjoys very much, if any, First Amendment protection for speech directly critical of his employer's policies. That doubt -- that "gray area" -- protects Duncan from liability.

Second, Duncan did not know that Carrington had made the statement until this lawsuit was filed. She knew only that it was someone in her department. There is simply no causal link between the statement and Carrington's discharge.

IV.

Carrington's First Amendment claim did survive summary judgment insofar as he sought prospective relief. However, after a bench trial, the district court held that Carrington was not entitled to reinstatement because he had not proved causation and, in any event, the speech was sufficiently disruptive to outweigh his interest as a private citizen to comment on matters of public concern. These rulings are not clearly erroneous.

The judgment of the district court is affirmed.

AFFIRMED

7